IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

MATTHEW SODERLIN,

                        Plaintiff,                       OPINION AND ORDER

     v.

                                                         18-cv-899-wmc

LORI DOEHLING, ANGELA THOMPSON,
PAULA BRADY, TIFFANY GIMENEZ,
DEBRA BELLIN and
ANDREA JOHNSON,

                         Defendants.

     *Pro se* plaintiff Matthew Soderlin is proceeding under 42 U.S.C. § 1983 on claims that current and former members of the nursing staff at the Redgranite Correctional Institution ("Redgranite") acted both negligently and with deliberate indifference in failing to fill his ongoing prescription for hydrocortisone on various occasions between July 12, 2017, and January 4, 2018. Specifically, the court granted Soderlin leave to proceed against the following employees of the Wisconsin Department of Corrections ("DOC"): Redgranite Health Service Manager ("HSM") Angela Thompson; Nursing Coordinator Lori Doehling; Registered Nurses Debra Bellin, Andrea Johnson,[1] Tiffany Gimenez and Paula Brady. Defendants Thompson, Doehling, Bellin and Johnson are represented together by Wisconsin Attorney General's Office ("State defendants"), while Brady and Gimenez are represented by separate counsel.

     Now before the court are two motions for summary judgment, one filed by the State Defendants, and one filed jointly by defendants Brady and Gimenez. (Dkt. ##75, 90.)

---

[1] Formerly identified in this lawsuit as Andrea Lamore.

All defendants seek summary judgment in their favor on the merits of plaintiff Soderlin's Eighth Amendment and negligence claims. In response, Soderlin now concedes that defendants Doehling, Thompson, Johnson and Brady are each entitled to summary judgment on the merits of his Eighth Amendment and state law claims. Having reviewed the undisputed evidence of record, the court accepts Soderlin's concession, but further finds on the record before it, that no reasonable juror could find that Bellin or Gimenez acted negligently or with deliberate indifference in responding to Soderlin's need for his prescription medications. Accordingly, the court is granting their motions for summary judgment as well, resulting in entry of final judgment in favor of defendants.

UNDISPUTED FACTS[2]

**A. Medication refill request policies**

All inmates at Redgranite are given a handbook instructing them on the proper procedure to request medication refills or communicate expiration needs. Specifically, the handbook instructs:

> Requests for medication refills are the inmate's responsibility. When five to seven days of the current supply remain, inmates must complete form DOC-3035C Medication/Medical Supply Refill Request. Inmates must complete the form with full name, inmate number, housing unit and medication name. . . . Refill requests should be sent to the HSU Sunday through Thursday; limit requests on weekends. All inmates must be aware of the prescription

---

[2] Unless otherwise indicated, the following facts are material and undisputed as drawn from the parties' proposed findings of fact and responses, as well as the underlying evidence of record where appropriate. In addition, defendants Brady and Gimenez ask the court to strike Soderlin's late-filed opposition brief, citing his failure to follow the court's deadlines and procedures as grounds. (Dkt. #122.) Given plaintiff's *pro se* status, the court will deny this motion, but also notes that plaintiff has conceded Brady's entitlement to summary judgment, and Gimenez is not prejudiced by the court's consideration of these submissions.

> expiration date on all controlled medications.  Inmates must notify HSU
> when they are less than a month from the prescription expiration date if they
> believe the medication must be renewed.

(Ex. 2 to Kallies Decl. (dkt. #95-2).)  According to Soderlin, the HSU does not keep track of the number of prescribed medications inmates actually possess at any given time. (Soderlin Dep. Tr. (dkt. #83) 75:19-21.)

### B. Soderlin's health conditions and requests for refills

Soderlin has been diagnosed with Addison's Disease, also called "Adrenal Insufficiency," or "Hypothyroidism."  Addison's is a disorder that causes the body to produce insufficient hormones, including cortisol.  According to Soderlin, a person with this condition can suffer what is called an "Addisonian crisis," an acute adrenal crisis that may require immediate medical treatment.  To treat his Addison's, Soderlin is prescribed hydrocortisone and levothyroxine specifically to treat Hypothyroidism.  Soderlin attests that when his hydrocortisone is not received on time, he suffers from extreme muscle fatigue, severe joint pain, nausea, vomiting, mental sluggishness, irritability and depression.

At some unspecified time, HSU staff offered to control and distribute Soderlin's regularly prescribed medications for him, but Soderlin declined.  Therefore, both his hydrocortisone and levothyroxine prescriptions were designated "keep-on-person" medications, meaning that Soderlin kept his prescriptions in his cell and, therefore, would self-administer them; it also meant that, *he* was responsible for submitting timely refill requests.

3

During the relevant time, Soderlin received 60-tab, 5 mg hydrocortisone blister packs.  Since he was prescribed 30 milligrams a day, each blister pack contained a ten-day supply.  According to Soderlin, however, his actual, daily dosage of hydrocortisone might have been greater because of the nature of his condition.  For example, Soderlin testified at his deposition that he would double his dosage of that medication in response to certain health events.  (Soderlin Dep. Tr. (dkt. #83) 73:23-74:8.)  Apparently as a result, the parties agree that Soderlin experienced multiple days in which he could not take *any* hydrocortisone between July 2017 and January 2018 because he was waiting for a refill of that medication.

Specifically, on July 9, 2017, Soderlin submitted a form Medication/Medical Supply Refill Request ("DOC-3035C"), asking that his hydrocortisone be refilled.  Non-defendant (and presumably Nurse) Zoe Kasper processed his request, and three days later the hydrocortisone was refilled, but Soderlin went a couple of days without that medication.  Before receiving that resupply, on July 12, 2017, Soderlin also complained to Sergeant Zach Bays that he was suffering from an "Addisonian crisis" because he was not receiving his hydrocortisone refills in a timely fashion.  Bays then informed Nurse Johnson about Soderlin's complaint, and she immediately called him to the HSU so that Soderlin could collect his refill, commenting that she did not know why his refill had not already been sent to his cell.

On July 20, 2017, Soderlin submitted another DOC-3035C form for hydrocortisone.  Gimenez processed that request, and Bellin filled it seven days later.  However, while awaiting his refill Soderlin went four days without his medication.

4

Similarly, on August 22, 2017, Soderlin submitted another request for a hydrocortisone refill, which Kasper processed, although Soderlin again went a few days without that medication. The same thing happened at the end of August: Soderlin submitted a refill request on August 31; it was stamped as received on September 1, 2017; and Nurse Gimenez processed his request on September 3, 2017. However, Soderlin did not receive the refill until September 7, and Soderlin maintains that he went three days without that medication.

As to this last refill at the end of August, Soderlin testified that *he* neither personally asked Gimenez for a refill of that medication, nor did he ever inform Gimenez that he was experiencing delays getting his hydrocortisone refilled. (Soderlin Dep. Tr. (dkt. #83) 49.) Finally, the August 31 form that Soderlin submitted did not include any indication that he needed the refill immediately to avoid running out of his hydrocortisone prescription. (Soderlin Ex. 9 (dkt. #100-9).)

Regardless, on September 6, while awaiting this refill, Soderlin experienced another crisis, which another inmate, Paul Nigl, witnessed. Nigl was also aware of the problems Soderlin had been experiencing obtaining refills. In particular, Nigl attests that Soderlin reported severe muscle and joint pains, as well as nausea, and that he appeared discolored and fatigued. As a result, Nigl helped Soderlin walk to the sergeant's station, where Soderlin informed Sergeant Bays that he had not received his hydrocortisone refill and was suffering from a crisis again. Bays then called the HSU. At that point, according to Soderlin, Nigl and a third inmate, Joseph Ewen, Bays spoke with Nurse Bellin, who Bays said in turn responded, "It's not like [Soderlin] is gonna die without his medication for

one night.  Tell him that we will get it to him tomorrow."  (Soderlin Decl. (dkt. #100) ¶ 12; Nigl Decl. (dkt. #98) ¶ 24; Ewen Decl. (dkt. #99) ¶ 24.)  In contrast, defendant Bellin attests that she did not see any of Soderlin's HSR's or refill requests related to his hydrocortisone prescription during this period of time, and she was unaware that Soderlin was not receiving refills of that medication timely.  (Bellin Decl. (dkt. #80) ¶¶ 8, 13.)

As for what happened after this disputed September 6 interaction, there is no dispute that (1) Soderlin was not taken to the HSU on September 6, and (2) his condition was even worse the next day, September 7.  Moreover, although he received his hydrocortisone refill from the HSU that same day, Soderlin had to be pushed in a wheelchair to the HSU because of his condition at the time.

A month later, on October 3, 2017, Soderlin submitted another refill request, and this time, went five days without the medication before it was refilled.  Accordingly, on October 11, 2017, Soderlin submitted a Health Services Request ("HSR"), informing HSM Thompson that he had been experiencing routine delays in receiving medication refills, which caused negative physical symptoms.  The next day, Johnson called Soderlin to the HSU, provided the hydrocortisone refill, and commented, "this is not my fault."  (Soderlin Decl. (dkt. #100) ¶ 13.)

At the end of October, Soderlin also shared with a psychological associate, Amanda Rentmeester, that he was afraid of dying from not receiving timely hydrocortisone refills. Soderlin also expressed concern that the nursing staff might not know that he sometimes needed to double his hydrocortisone dose.  Rentmeester then emailed HSM Thompson about the delays Soderlin was experiencing, and also advised that Soderlin might

6

sometimes need to take an extra dose, which might make it seem like he was requesting refills too early.  Rentmeester further reported that Soderlin was nauseated and sick.

On November 28, 2017, an endocrinologist confirmed that Soderlin might need do double his hydrocortisone at times.  On December 20, 2017, Soderlin was also examined at UW-Madison by endocrinologist Dawn Davis.  Soderlin informed her of the delays in receiving his hydrocortisone refills, and Dr. Davis responded that she would speak with Nurse Brady about the problem.

## OPINION

Summary judgment is appropriate if the moving party shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  If the moving party meets this burden, then the non-moving party must provide evidence "on which the jury could reasonably find for the nonmoving party" to survive summary judgment.  *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406–407 (7th Cir. 2009), *quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

Here, all defendants seek summary judgment on the merits of plaintiff's Eighth Amendment and Wisconsin negligence claims, and plaintiff concedes that summary judgment should be granted in favor of all defendants, save Bellin and Gimenez.  (*See* dkt. #97, at 9; dkt. #111, at 1.)  The court will enter summary judgment in favor of defendants Thompson Doehling, Johnson and Brady based on that concession, and focus its analysis on defendants Bellin and Gimenez alone.

7

## I.      Eighth Amendment claims

The Eighth Amendment gives prisoners the right to receive adequate medical care, *Estelle v. Gamble*, 429 U.S. 97 (1976).  To prevail on a claim of constitutionally inadequate medical care, an inmate must demonstrate two elements:  (1) an objectively serious medical condition; and (2) a state official who was deliberately (that is, subjectively) indifferent. *Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019); *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011).  A medical need is "serious" if it so obviously requiring treatment that even a lay-person could recognize the need for medical attention, carries risk of permanent serious impairment if left untreated, results in needless pain and suffering, or significantly affects an individual's daily activities.  *Gutierrez v. Peters*, 111 F.3d 1364, 1371-73 (7th Cir. 1997).

"Deliberate indifference" is a high standard; it means that the official was aware that the prisoner faced a substantial risk of serious harm but disregarded that risk by consciously failing to take reasonable measures to address it.  *Forbes v. Edgar*, 112 F.3d 262, 266 (7th Cir. 1997).  Thus, acts of deliberate indifference requires *more than* negligence, or even gross negligence, but requires something less than *purposeful* acts.  *Farmer v. Brennan*, 511 U.S. 825, 836 (1994).  The threshold for deliberate indifference is met where:  (1) "the official knows of and disregards an excessive risk to inmate health or safety"; *or* (2) "the official [is] both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," *and* he or she draws that inference yet deliberately fails to take reasonable steps to avoid it.  *Id*. at 837; *see also Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) ("While evidence of malpractice is not enough for a plaintiff to survive

summary judgment on an Eighth Amendment claim, nor is a doctor's claim he did not know any better sufficient to immunize him from liability in every circumstance."); *Burton v. Downey*, 805 F.3d 776, 785 (7th Cir. 2015) ("the infliction of suffering on prisoners can be found to violate the Eighth Amendment only if that infliction is either deliberate, or reckless in nature in the criminal sense").

Defendant Bellin seeks summary judgment based on a lack of evidence to support a finding that she was even aware the plaintiff was not receiving timely refills of hydrocortisone. Plaintiff disputes Bellin's lack of knowledge, citing the September 6, 2017, incident in which plaintiff reported a severe crisis to Sergeant Bays, who plaintiff claims then spoke to Bellin. Unfortunately for plaintiff, statements that Bays is alleged to have attributed to Bellin constitute hearsay, since Bays has not attested to any such conversation. Therefore, the court is left with evidence that plaintiff and Bays discussed plaintiff's symptoms, that Bays called someone from the HSU, and that Bays reported back that an HSU staff member said he could wait until the next day to receive his hydrocortisone. This evidence does not support a reasonable finding that *Bellin* was aware that plaintiff (1) had run out of his hydrocortisone prescription, *or* (2) was experiencing adverse effects. Finally, and most importantly, there is no admissible evidence that Bellin failed to take corrective action despite that knowledge.[3]

---

[3] Soderlin's statement in his declaration is also arguably inadmissible under the "sham affidavit" rule, which "prohibits a party from submitting an affidavit that contradicts the party's prior deposition or other sworn testimony." *See James v. Hale*, 959 F.3d 307, 315-16 (7th Cir. 2020). During his deposition, Soderlin testified that he did not know with whom Bays spoke. (Soderlin Dep. Tr. (dkt. #83) 87.) Yet in opposition to defendants' motions for summary judgment, Soderlin submitted his own declaration and declarations from two inmate witnesses, Paul Nigl and Joseph Ewen, all now claiming to describe Soderlin's conversation with Sergeant Bays, including that he

No other evidence of record suggests that Bellin was aware of or disregarded plaintiff's problems getting timely refills of his medication.  In particular, while the record indicates Bellin honored plaintiff's request for a refill in July of 2017, no evidence suggests that *at the time* Bellin handled his refill request, she was aware that plaintiff had run out of his hydrocortisone for *any* period before she processed the request, much less that she failed to take corrective action after learning about gaps in his receipt of medication.

Plaintiff also argues that all HSU staff *should* have been aware that he would run out of his hydrocortisone because he might need to increase his dose depending on symptoms. The record does not support a finding that anyone in the HSU, much less Bellin specifically, had reason to believe plaintiff would need more frequent refills of hydrocortisone because of unusual circumstances.  To the contrary, it is undisputed that *plaintiff* opted to keep his medications in his cell, including for hydrocortisone, *and* plaintiff does *not* allege he informed anyone at HSU when he was taking additional doses of this medication.  Thus, no reasonable jury could find that HSU staff generally, or Bellin in particular, should have anticipated his early request for a refill.  Second, without keeping the HSU staff apprised of his fluctuating hydrocortisone doses in real time, along with a heads-up as to the need for quicker refills, it would be unreasonable to expect any other HSU staff, including Bellin, to anticipate and hasten plaintiff's medication refills.  Thus, nothing in the record allows an inference that Bellin consciously disregarded plaintiff's

---

specifically identified Nurse Bellin as the person he spoke with *and* repeated Bellin's exact words. Although Nigl's and Ewen's statements may not be rejected under the sham document rule, Bays' statement as to what Bellin said is still inadmissible hearsay evidence, since Soderlin has not submitted a declaration from Bays, and he is not a party opponent.  *See* Fed. R. Evid. 801(d)(2)(A).

need for his hydrocortisone or delayed refilling that prescription once she was aware of the problem, and just like the other State Defendants, Bellin is entitled to summary judgment in her favor.

Defendant Gimenez also seeks summary judgment on much the same basis:  no evidence suggests that she consciously disregarded gaps in plaintiff's hydrocortisone refills either.  While plaintiff again argues in opposition that one could infer that Gimenez *knew* plaintiff was experiencing delays in receiving his hydrocortisone, the evidence of record does not support that finding.  If anything, the evidence before the court at summary judgment is that Gimenez handled plaintiff's requests for a refill of hydrocortisone in July and September of 2017, and on both occasions, plaintiff's request slips failed to indicate that his need for a refill was urgent, nor did he report greater use for hydrocortisone than prescribed or experiencing gaps in the past.  Therefore, like the other defendants, Gimenez had no reason to question whether plaintiff receiving his refill within the seven days advised by the institution handbook would be adequate, or at least a reasonable jury would have to find on this record.  Finally, since both the July and September refill requests were filled within a week of plaintiff's submission of his request, there is also no reason to infer Gimenez acted with negligence, much less deliberate indifference.

## II.   Wisconsin negligence claims

In addition, the State Defendants seek summary judgment as to plaintiff's claim against Nurse Bellin on the merits, because he disclosed no expert to establish the relevant standard of care by a nurse in refilling prescriptions, and even if an expert is not required,

Soderlin failed to comply with Wisconsin's notice of claim statute.[4]  Defendant Gimenez seeks summary judgment on the merits of this claim as well, for failure to disclose an expert.

The general rule is that federal courts should relinquish jurisdiction over state law claims if all federal claims are resolved before trial.  28 U.S.C. § 1367(c)(3); *Burritt v. Ditlefson*, 807 F.3d 239, 252 (7th Cir. 2015); *see also Groce v. Eli Lilly & Co.*, 193 F.3d 496, 499-501 (7th Cir. 1999) ("[I]t is well established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial.").  However, a court may depart from "usual practice," and continue to exercise supplemental jurisdiction, if the circumstances weigh in favor of such action.  For example, a court need not send back to state court "'doomed litigation' that will only be dismissed once it gets there." *Groce*, 193 F.3d at 502.  In such circumstances, the district court should retain supplemental jurisdiction "because when a state-law claim is clearly without merit, it invades no state interest -- on the contrary, it spares overburdened state courts additional work that they do not want or need -- for the federal court to dismiss the claim on the merits, rather than invite a further, and futile, round of litigation in the state courts." *In re Repository Tech., Inc.*, 601 F.3d 710, 725 (7th Cir. 2010) (internal quotation omitted).

Here, plaintiff's negligence claims against Bellin and Gimenez fail for the same reason his Eighth Amendment claims fail:  no evidence of record suggests that either defendant was aware that plaintiff was experiencing a pattern of delays and failed to take

---

[4]  The court understands the State Defendants to be preserving the notice of claim question for appeal purposes only and has not interpreted plaintiff's argument as a request for reconsideration of this question.

corrective action.  Implicit in the court's discussion above, therefore, is that no reasonable fact-finder could infer that either Bellin or Gimenez breached a duty of care to plaintiff, for the simple fact that no reasonable trier of fact could fine either defendant was aware that plaintiff was experiencing gaps in receiving his hydrocortisone, much less that he was being adversely affected by these gaps.  Accordingly, defendants Bellin and Gimenez are also entitled to summary judgment on plaintiff's negligence claim, and this case will be dismissed in its entirety.

## ORDER

1.  Defendant Brady and Gimenez's motion to strike (dkt. #122) is DENIED.

2.  The State Defendants' motion for summary judgment (dkt. #75) is GRANTED.

3.  Defendant Brady and Gimenez's motion for summary judgment (dkt. #90) is GRANTED.

4.  The clerk of court is directed to enter final judgment in defendants' favor and close this case.

Entered this 16th day of May, 2022.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge